IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| T. Aladdin Mozingo, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 4:11-cv-522-TLW-KDW |
| | ) | |
| Wells Fargo Bank, National | ) | |
| Association, Successor by | ) | |
| Merger to Wachovia Bank, | ) | |
| National Association, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

# ORDER

The plaintiff, T. Aladdin Mozingo ("plaintiff" or "Mozingo"), filed this civil action on March 4, 2011, against the defendant, Wells Fargo Bank, National Association, Successor by Merger to Wachovia Bank, National Association ("defendant" or "Wachovia"). (Doc. # 1). The plaintiff alleges claims for breach of fiduciary duty and constructive and actual fraud. (Doc. # 1). On April 22, 2011, the defendant moved to dismiss the plaintiff's fraud claims. (Doc. # 7). The Court denied this motion. (Doc. # 53).

On December 29, 2011, the defendant moved to strike the plaintiff's request for a jury trial. (Doc. # 62). The plaintiff responded to the motion (Doc. # 70), and the defendant submitted a reply (Doc. # 71). On February 29, 2012, the defendant moved for summary judgment. (Doc. # 74). The plaintiff filed a response to the defendant's motion for summary judgment and a motion for its memorandum of law and exhibits to be placed under seal.[1] (Docs.

---

[1] United States Magistrate Judge Kaymani D. West granted the motion to seal with respect to the memorandum of law and exhibits 1 through 22. (Doc. # 97). Judge West ordered that the following not be sealed: exhibit 23 and the full appendix submitted with the plaintiff's

91, 99).   On April 27, 2012, the defendant submitted a reply in support of its motion for summary judgment.  (Doc. # 98).  The Court held a hearing on the motion to strike the plaintiff's request for a jury trial and the motion for summary judgment on May 4, 2012.  (Doc. # 104). After careful consideration of applicable law, arguments of counsel, and memoranda submitted, the Court concludes as follows with respect to these motions.

## FACTS

The plaintiff is the son of the now deceased Margaret Mozingo and James P. "Spot" Mozingo, a well-known trial attorney in Florence, South Carolina.   Although he has not practiced law since 1998, the plaintiff also has a legal education, as he received a law degree from the University of South Carolina in 1988 and practiced with several firms before eventually opening his own firm in 1995.  Mozingo Dep. pp. 14, 17-18 (Doc. # 74, attach. 3).

On January 3, 1993, the plaintiff created his own revocable trust, the Thomas Aladdin Mozingo Revocable Trust, which is at issue in this case.  (Doc. # 74, attach. 7).  The plaintiff and the defendant served as co-trustees of the plaintiff's revocable trust from February 8, 2006, to May 1, 2008.  (Doc. # 74, attachs. 8, 9, 10).  The plaintiff was also the settlor and a beneficiary of the trust.  (Doc. # 74, attachs. 8, 9, 10).  Ms. Delores Jordan was the trust officer at Wachovia who handled the plaintiff's trust account in addition to other Mozingo family trusts.  Jordan Dep. p. 13 (Doc. # 99, attach. 2).  She had a long-term relationship with the Mozingo family through her work as a trust officer.  Id. at p. 31.

Following his mother's death in July 2005, the plaintiff received assets totaling approximately $11 million.  Mozingo Dep. pp. 50-51 (Doc. # 74, attach. 3).  The plaintiff married, and the couple decided to build a house on a lake front lot in Florence, South Carolina

---

motion to seal.  (Doc. # 97).  On May 3, 2012, all of the documents addressed by Judge West's Order were filed in CM/ECF.  (Docs. 99-101).

(the "Lake House Project"). Compl. ¶ 10. The plaintiff originally anticipated the Lake House Project costing approximately $2 million. Mozingo Dep. p. 130; Compl. ¶ 10. However, by the time of completion, the plaintiff had spent approximately $5.1 million on the project. Mozingo Dep. p. 140 (Doc. # 74, attach. 3).

In December 2005, the plaintiff entered into a construction contract with Master's Builders for the Lake House Project. (Doc. # 74, attach. 11). To finance the project, the plaintiff obtained an initial line of credit from Bank of America and pledged the assets in his trust account held at Bank of America as collateral for the loan. Compl. ¶ 12; Mozingo Dep. pp. 21, 23-25 (Doc. # 74, attach. 3). The plaintiff then proceeded to discuss options for additional financing with both the defendant and Bank of America. Mozingo Dep. p. 105 (Doc. # 74, attach. 3). He chose to finance the project with the defendant, and on June 20, 2006, he obtained an initial loan of $250,000 from the defendant to pay off the line of credit he obtained previously from Bank of America (the "June 2006 loan"). Compl. ¶ 12; (Doc. 74, attach. 12). To secure the $250,000 loan, Mozingo and Jordan, as co-trustees, signed a security agreement pledging the plaintiff's Trust Account -841 ("trust account") as collateral for the loan. Compl. ¶ 13; (Doc. # 74, attach. 15). The security agreement contained a "dragnet" clause stating the trust account would "secure payment and performance of any and all obligations of [the plaintiff] . . . to [defendant] . . . now existing or hereafter arising or acquired."[2] (Doc. # 74, attach. 15).

In July 2006, the plaintiff took out a separate $2 million line of credit from the defendant for the Lake House Project (the "July 2006 loan"). Compl. ¶ 16; (Doc. # 74, attach. 13). To secure the loan, the plaintiff entered into a security agreement that described the collateral as the

---

[2] The plaintiff argues the inclusion of this dragnet clause constituted a breach of fiduciary duty. However, he asserts no attempt by the defendant to enforce it or injury caused by its inclusion.

"building materials, furniture, fixtures, equipment, and other personal property located at 2101 Duck Hunter Pointe, Florence, South Carolina." (Doc. # 74, attach. 18). Additionally, the plaintiff agreed to maintain liquid assets of at least $2.5 million until he paid off the loan. (Doc. 74, attach. 13). The plaintiff alleges he relied on the defendant's advice and, more specifically, Jordan's advice when he entered into the June 2006 and July 2006 loan transactions. Compl. ¶¶ 11-12, 16.

In January 2008, the defendant agreed to increase the $250,000 line of credit to $2 million. (Doc. # 74, attach. 21). Because of cost overruns, the additional funds were needed for construction of the Lake House Project. Compl. ¶ 21. As with the initial $250,000 loan, the extension of additional credit was secured by assets in the trust account. The plaintiff again alleges that he relied on Jordan's advice in increasing the line of credit. Id.

Consequently, following the January 2008 loan transaction, the plaintiff had two $2 million loans with Wachovia, both of which had a maturity date of June 30, 2008. (Doc. # 74, attachs. 13, 21). In April 2008, the plaintiff alleges that the defendant demanded additional collateral for the loans and that Jordan advised him to transfer approximately $1.35 million of International Speedway Corporation ("Speedway") stock from another unencumbered account into the trust account. Compl. ¶ 27. The plaintiff transferred the stock, which allegedly increased the value of the trust account from $3.8 million to $5.1 million. Compl. ¶ 28. Also in April 2008 and with the June 30, 2008 maturity date approaching, the plaintiff alleges Jordan advised him to consolidate the two $2 million loans into one $4 million loan with the trust account pledged as collateral for the loan. Pl. Resp. to Def. Mot. Summ. J. p. 4 (Doc. # 99). Arnold Ceips, a bank officer in the defendant's credit department, on April 21, 2008, and Jordan, on April 22, 2008, signed a "Hold Indication & Acknowledgment Worksheet" ("Hold Indication

form") showing the plaintiff as the borrower, a hold amount of $5 million, and a loan amount of $4 million.  (Doc. # 99, attach. 10).

Notably, on May 1, 2008, the plaintiff entered into an "Amended and Restated Revocable Trust Agreement," which removed the defendant as a trustee of his revocable trust.  (Doc. # 74, attach. 9).  Through a letter dated May 12, 2008, Ray Massey, as attorney for the plaintiff, informed the defendant in writing that the plaintiff had removed the defendant as a co-trustee but would continue to use the defendant's investment services.  (Doc. # 74, attach. 22).  Then on June 3, 2008, the plaintiff entered into an "Investment Agency Agreement" with the defendant and converted his trust account into Investment Agency Account -437 ("investment account"). (Doc. # 74, attach. 23); Pl. Resp. to Def. Mot. Summ. J., p. 5 (Doc. # 99).  On June 12, 2008, the plaintiff signed a new promissory note with the defendant for a $4 million line of credit (the "June 2008 loan").  (Doc. # 74, attach. 24).  The plaintiff asserts this was a consolidation while the defendant argues the new loan paid off and retired the outstanding debt.  Regardless, the plaintiff signed a new security agreement, dated June 12, 2008,  pledging the assets in his investment account as collateral for the loan.  (Doc. # 74, attach. 25).

The June 12, 2008 security agreement required that the collateral securing the loan exceed $4.8 million at all times and set forth what constituted eligible collateral toward the $4.8 million requirement.  Id.  If at any time the amount of eligible collateral fell below $4.8 million, the plaintiff had three days to remedy the shortfall.  Id.  The agreement set forth that only stocks which were trading on a public exchange with a value greater or equal to $10 per share counted as eligible collateral.  Id.  The defendant does not dispute that one of its credit officers, Arnold Ceips, told the plaintiff during the negotiation of the June 2008 loan that the Speedway stock would count as eligible collateral.  Def. Mem. Law Supp. Mot. Summ. J., p. 8 (Doc. # 74, attach.

1).  Ceips made this representation because he believed the stock had attributes of an eligible investment.  Ceips Dep. p. 71 (Doc. # 74, attach. 14).  It turned out that the stock was not an eligible investment under the June 2008 security agreement.  Def. Mem. Law Supp. Mot. Summ. J., p. 8 (Doc. # 74, attach. 1).  Nonetheless, the defendant, at least initially, upheld its promise to count the Speedway stock toward the minimum collateral requirement.  Id.

The plaintiff alleges that sometime between June 12, 2008, and October 31, 2008, the defendant stopped counting the Speedway stock toward the minimum collateral requirement and issued a collateral call in October 2008 because, without the Speedway stock, the value of the eligible collateral fell below $4.8 million.  Pl. Resp. to Def. Mot. Summ. J., p. 6 (Doc. # 99).  The plaintiff further asserts that the defendant told him "it would agree to count[] the Speedway stock again to bring the loan back into margin if Mozingo would sell 9,018 shares of First Carolina Bancshares ('FCB') stock and apply the proceeds to pay down the loan."  Id.  However, the only possible buyer for the stock was First Carolina Bank itself.  Id. Specifically, the Beasley family, the majority owner of First Carolina Bank, was the only possible buyer, and they were willing to pay only $65 per share.  Id.  On August 14, 2008, an analyst for the defendant valued the stock at $221 per share.  Id. at 7; McDowell Dep., ex. 23 (Doc. # 99, attach. 5).  In his report, the analyst noted that First Carolina Bank management appeared "reluctant to repurchase shares at anything close to market value or even book value."  Pl. Resp. to Def. Mot. Summ. J., p. 7; McDowell Dep., ex. 23 (Doc. # 99, attach. 5).  Additionally, the analyst recommended holding the stock for a higher price or a recapitalization.  Pl. Resp. to Def. Mot. Summ. J., p. 7; McDowell Dep., ex. 23 (Doc. # 99, attach. 5).

The plaintiff alleges the analyst's advice was ignored and the defendant "forced" the plaintiff to sell the 9,018 shares for $65 per share, which generated sales proceeds of

approximately $586,000 that was paid to the defendant to reduce the loan balance.  Pl. Resp. to

Def. Mot. Summ. J., p. 7 (Doc. # 99).  At $221 per share, the plaintiff asserts the 9,018 shares

were worth almost $2 million.  Id.  As a result, he alleges a loss of approximately $1.5 million in

addition to a significant capital gains tax liability because of the sale of this low basis stock.  Id.

At the time he sold the stock, the plaintiff was aware it had been valued at $221 per share.  May

4, 2012 Hr'g Tr. pp. 84-85 (Doc. # 110).

The plaintiff asserts there were additional collateral calls in October 2008 and March

2009 that resulted in additional stock liquidations and additional tax liability.[3]  Id.  These sales

combined with the liquidation of the FCB stock allegedly resulted in the plaintiff losing a total of

approximately $2.5 million.  Id.

## SUMMARY JUDGMENT STANDARD

Pursuant to Federal Rule of Civil Procedure 56(a), the moving party is entitled to

summary judgment if the pleadings, responses to discovery, and the record reveal that "there is

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury

could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

248 (1986).  As the party seeking summary judgment, the defendant bears the initial

responsibility of informing this Court of the basis for its motion.  See Celotex Corp. v. Catrett,

477 U.S. 317, 323 (1986).  This requires that the defendant identify those portions of the

"pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any," which it believes demonstrate the absence of a genuine dispute of material

fact.  Celotex, 477 U.S. at 323; see also Anderson, 477 U.S. at 249.

---

[3]  The plaintiff presents no evidence or arguments in connection with these other alleged
collateral calls and stock liquidations.

Though the defendant bears this initial responsibility, the plaintiff must then produce "specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324; see Fed R. Civ. P. 56(e). In satisfying this burden, the plaintiff must offer more than a mere "scintilla of evidence" that a genuine dispute of material fact exists, Anderson, 477 U.S. at 252, or that there is "some metaphysical doubt" as to material facts, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Rather, the plaintiff must produce evidence on which a jury could reasonably find in his favor. See Matsushita, 475 U.S. at 587.

In considering a motion for summary judgment, this Court construes all facts and reasonable inferences in the light most favorable to the nonmoving party. See Miltier v. Beorn, 896 F.2d 848, 852 (4th Cir. 1990). Summary judgment is proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there [being] no genuine issue for trial." Matsushita, 475 U.S. at 587 (internal quotations omitted).

## DISCUSSION

### a. Breach of Fiduciary Duty

The plaintiff alleges he had a fiduciary relationship with the defendant and that the defendant breached duties arising out of that relationship. "A fiduciary relationship is founded on the trust and confidence reposed by one person in the integrity and fidelity of another." Regions Bank v. Schmauch, 582 S.E.2d 432, 444 (S.C. Ct. App. 2003). "A fiduciary relationship exists when one reposes special confidence in another, so that the latter, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one reposing confidence." O'Shea v. Lesser, 416 S.E.2d 629, 631 (S.C. 1992). As a general rule, such a relationship "cannot be established by the unilateral action of one party" but rather "[t]he other party must have actually accepted or induced the confidence placed in him." Regions

Bank, 582 S.E.2d at 444.  In addition, generally, "mere respect for another's judgment or trust in his character is usually not sufficient to establish . . . a [fiduciary] relationship."  Burwell v. S.C. Nat'l Bank, 340 S.E.2d 786, 790 (S.C. 1986).  Instead, "[t]he facts and circumstances must indicate that the one reposing the trust has foundation for his belief that the one giving advice or presenting arguments is acting not in his own behalf, but in the interests of the other party."  Id.

"One standing in a fiduciary relationship with another is subject to liability to the other for harm resulting from a breach of duty imposed by the relation."  Moore v. Moore, 599 S.E.2d 467, 473 (S.C. Ct. App. 2004).  If a breach of fiduciary duty occurs, the plaintiff is entitled to damages for harm caused by the breach.  Id.  "Damages in an action for breach of a fiduciary duty are those proximately resulting from the wrongful conduct of the defendant."  Id; see also Concerned Dunes West Residents, Inc. v. Georgia-Pacific Corp., 562 S.E.2d 633, 638 (S.C. 2002).

While "[t]he normal bank-depositor arrangement creates a creditor-debtor relationship rather than a fiduciary one[,] . . . [i]n limited circumstances, . . . a fiduciary relationship may be created between a bank and a customer if the bank undertakes to advise the customer as a part of the services the bank offers."  Id (citation omitted).  "Such a relationship charges the bank with a duty to disclose material facts which may affect its customer's interests."  Id.  During a portion of the time period at issue in this case, the defendant acted as a trustee.  "A trustee, as a fiduciary, is under a duty of loyalty to act solely in the best interest of the beneficiary."  Yates v. Yates, 354 S.E.2d 800, 801 (S.C. Ct. App. 1987); see also S.C. Code Ann. § 62-7-802 ("A trustee shall administer the trust solely in the interests of the beneficiaries."); Ramage v. Ramage, 322 S.E.2d 22, 27 (S.C. Ct. App. 1984) ("As trustees, they were under a duty of loyalty to administer the trust property solely in her interest as the beneficiary.").

In the complaint, the plaintiff asserts the defendant breached fiduciary duties owed to him on a number of occasions between 2006 and 2008.  However, in his response to the defendant's motion for summary judgment, the plaintiff argues his claim does "not arise in June 2006 but in April 2008, June 2008 and October 2008 when the breaches actually occurred."  Pl. Resp. to Def. Mot. Summ. J., p. 23 (Doc. # 99).  He also avers that "[t]his action is based on alleged breaches of fiduciary duty in April, June, and October of 2008 - - well after the April 1, 2007 cut-off and well within the three-year statute of limitations."  Id. at p. 24.  Furthermore, the plaintiff's alleged injury is tied to the sale of the FCB stock, which the plaintiff asserts was caused by the defendant's actions in April, June, and October of 2008.  Additionally, in his response to the defendant's summary judgment motion, the plaintiff does not assert or demonstrate how the alleged breaches of fiduciary duty that occurred prior to April 2008 injured him.  Therefore, the Court will focus its analysis on the defendant's actions during April through October of 2008.

*1. June 2008 Loan Transaction*

The defendant asserts it is entitled to summary judgment with respect to the breach of fiduciary duty claim.  The defendant argues that after the plaintiff revoked the trust relationship by removing it as a co-trustee in May 2008, it owed no fiduciary duties related to the lending transaction into which the plaintiff entered in June 2008.

In response, the plaintiff argues that the defendant in April 2008, while it was serving as a co-trustee, advised him to consolidate his two $2 million loans into one $4 million loan with the trust account pledged as collateral.  He asserts the defendant, when it rendered this advice, was acting in its best interest as a lender rather than his best interest as a beneficiary.  Further, with the trust valued at $5.1 million at the time the plaintiff entered into the loan and a minimum collateral requirement of $4.8 million under the June 2008 security agreement, the plaintiff

argues there was little room for fluctuations in the value of the collateral.  In addition, the plaintiff asserts that the defendant had no plan for what to do if the account's value fell below $4.8 million.  He also advances that the defendant was aware the trust account contained a substantial amount of low-basis legacy stocks, specifically the Speedway stock and FCB stock, which could not be sold without significant tax consequences for him.

As evidence that the defendant rendered advice in connection with the June 2008 loan transaction in April 2008, the plaintiff cites Jordan's deposition testimony.  When asked about the circumstances surrounding the transfer of the Speedway stock into the trust account in April 2008, Jordan stated: "It seems to me like they were going to - - they needed an increase with their loan and I don't know if that's in conjunction but they needed that to help support the, the credit line."  Jordan Dep. p. 155 (Doc. # 99, attach. 2).  The plaintiff also references the Hold Indication form, which Ceips and Jordan signed, respectively, on April 21 and April 22 of 2008.  (Doc. # 99, attach. 10).  The form shows a hold amount of $5 million and a loan amount of $4 million.  Id.  Additionally, the plaintiff cites an email sent by Arnold Ceips on June 4, 2008, to several other Wachovia employees, which the plaintiff asserts shows "the paperwork for the loan consolidation was . . . prepared for the Trust account and had to be re-drafted when Mozingo moved to the [Investment Agency Agreement] at the last minute."  Pl. Resp. to Def. Mot. Summ. J., pp. 24-25 (Doc. # 99) (citing Doc. # 99, attach. 13).  This email is addressed to Jordan and asks whether she was "able to obtain a copy of the Trust agreement for review" and how the investment account would be titled.  The email then states: "Once we have the collateral account issues answered, we'll request for new documents for the $4 MM facility."  (Doc. # 99, attach. 13).

The plaintiff has not presented evidence from which a jury could conclude that the defendant advised him in April 2008 to enter into the June 2008 loan. On the pages of Jordan's deposition testimony the plaintiff cites in support of his argument, Jordan does not state that she specifically advised the plaintiff to enter into the June 2008 loan. Additionally, the June 4, 2008 email does not show that the defendant, while it was a co-trustee, advised the plaintiff to enter into the June 2008 loan. The plaintiff's primary piece of evidence regarding advice rendered in April 2008 is the Hold Indication form. This form, which Ceips and Jordan signed, respectively, on April 21 and April 22 of 2008, shows a hold amount of $5 million and a loan amount of $4 million. (Doc. # 99, attach. 10). At the time of the signing of this document, both of the plaintiff's $2 million loans had maturity dates of June 30, 2008. (Doc. # 74, attachs. 13, 21). Consequently, the plaintiff had to take some action with respect to these loans prior to June 30th or face default. It thus made sense for there to be a discussion about the outstanding loans between the plaintiff and defendant, both of whom were trustees of Mozingo's revocable trust. However, the plaintiff has not presented evidence upon which a jury could conclude the defendant, in April 2008, went beyond discussing the outstanding loans and pending June 30 maturity dates. The plaintiff has not presented evidence based on which a jury could find the defendant, in April 2008, advised him to enter into the June 2008 loan the way it was structured or advised him that it was his best option to the exclusion of other financing arrangements.

Even assuming advice relating to the June 2008 loan was rendered in April 2008, summary judgment is appropriate because of the relationship change that occurred in May 2008, specifically the revocation of the trust relationship. The Hold Indication form was signed on April 21/22, 2008, but the plaintiff did not act on the advice alleged when it was rendered. Rather, on May 1, 2008, ten days after the Hold Indication form was signed, the plaintiff

executed the Amended and Restated Revocable Trust Agreement, which revoked the trust relationship by removing the defendant as a co-trustee.  (Doc. # 74, attach. 9).  Then in a letter dated May 12, 2008, drafted by his attorney, the plaintiff informed the defendant that he had "removed Wachovia Trust as Trustee of his Revocable Living Trust" and that he wished to "continue to use the investment services of Wachovia."  (Doc. # 74, attach. 22).  The plaintiff not only removed the defendant as trustee in May, he entered into a new relationship with the defendant on June 3, 2008, by signing the Investment Agency Agreement ("IAA" or "Agreement"), which outlined the defendant's powers and responsibilities going forward.  (Doc. # 74, attach. 23).  After all of this occurred, he then signed the June 2008 loan documents on June 12, 2008.  In light of what transpired between April 2008 and the signing of the June 2008 loan documents, specifically the revocation of the trust relationship, the Court finds that the defendant owed the plaintiff no fiduciary duties relating to his decision to enter into the June 2008 loan.  Again, assuming the defendant gave advice regarding the June 2008 loan in April 2008, the Court concludes that the plaintiff cannot look back to this advice to impose a duty on the defendant to protect his interest when he later entered into the loan.  The plaintiff cannot have it both ways.  He cannot revoke his trust relationship with the defendant and still expect the defendant to act with the care of a trustee when he subsequently enters into a loan, simply because a discussion related to the loan occurred prior to his removing the defendant as a co-trustee.[4]

---

[4] Moreover, the plaintiff did not specifically structure the June 2008 loan in the manner in which he alleges the defendant advised him.  The plaintiff asserts the Hold Indication form is documentation of a plan to consolidate the two $2 million loans and pledge the trust account as collateral.  Pl. Resp. to Def. Mot. Summ. J., p. 4 (Doc. # 99).  However, in the end, the plaintiff did not secure the $4 million loan with the trust account.  Rather, he executed the IAA, which imposed fewer duties on the defendant than when it acted as a trustee.  He then converted the trust account into an investment account, and pledged the assets in the investment account as

The plaintiff also asserts the defendant owed fiduciary duties to him in connection with his decision to enter into the June 2008 loan transaction because the defendant was his agent under the Investment Agency Agreement.  Under the IAA, the defendant agreed to act as the plaintiff's agent with respect to certain matters related to investment of assets in the investment account.  Again, the plaintiff terminated the trust relationship on May 1, 2008, and signed the IAA on June 3, 2008.  Pursuant to the IAA, the defendant was "to provide investment advice and review of the Account, and to make periodic recommendations to [the plaintiff] with regard to the investment management of the Account assets."  IAA, art. I (Doc. # 74, attach. 23).  While the relationship between the plaintiff as principal and the defendant as agent was fiduciary in nature, see Darby v. Furman Co., 513 S.E.2d 848, 850 (S.C. 1999), the extent of the relationship and corresponding duties owed are limited to only what is set forth in the Investment Advisory Agreement, see Pavlovich v. Nat'l City Bank, 435 F.3d 560, 568 (6th Cir. 2006) (holding that defendant bank "was bound to no fiduciary duty outside the terms of the relevant agreements"); Fulcrum Financial Partners v. Meridian Leasing Corp., 230 F.3d 1004, 1012 (7th Cir. 2000) ("[W]e cannot work from sweeping generalizations about agency law when the parties have created a more limited relationship."); Restatement (Second) of Agency § 376 ("The existence and extent of the duties of the agent to the principal are determined by the terms of the agreement between the parties, interpreted in light of the circumstances under which it is made, except to the extent that fraud, duress, illegality, or the incapacity of one or both of the parties to the agreement modifies it or deprives it of legal effect.").  Indeed, Article X of the IAA states that

---

collateral.  The plaintiff has not asserted or presented evidence that the defendant specifically advised him during the time it was a trustee to enter into a loan with assets in an investment account as collateral.

"[a]gent's rights, powers, and duties shall be limited to those specifically listed above with respect to the Assets held in the Account."  (Doc. # 74, attach. 23).

The plaintiff argues that Article I, paragraph 10 of the IAA imposed a duty to protect the plaintiff's interests in connection with his decision to enter into the June 2008 loan transaction. This provision provides that "[a]gent shall have authority to do all acts, whether or not expressly authorized, which it may deem necessary or proper for the protection of the assets held hereunder."  <u>Id.</u>  The plaintiff's expert, Mr. Julian Walker, also opined that the defendant continued to serve in a fiduciary capacity as agent under the IAA for the plaintiff and that the duty of loyalty was among the duties owed.  (Doc. # 99, attach. 8).  However, the Court does not find that the IAA or the discretionary authority conferred in Article I, paragraph 10 of the IAA created duties relating to the plaintiff's decision to enter into the June 2008 loan transaction. More specifically, the Court does not conclude that the IAA gave rise to a duty to protect the investment account assets from a decision by the principal himself (plaintiff) to pledge the assets as collateral for a loan.  The imposition of such a duty is beyond the scope of the IAA and would essentially place the duties of a trustee on the defendant, rendering meaningless the change in the relationship between the parties that occurred in May 2008 when the plaintiff terminated the trust relationship.

Finally, the plaintiff asserts that a fiduciary relationship and corresponding duties independent of the IAA continued to exist after the defendant was removed as trustee.  At his deposition, the plaintiff testified that the IAA "never really changed the relationship," that Jordan "said that everything - - she just kept everything the same and kept it on the trust platform," and that he would still call Jordan if he needed anything.  Mozingo Dep. pp. 221-22 (Doc. # 99, attach. 1).

15

The Court does not find there was a fiduciary relationship independent of the IAA which gave rise to duties relating to the plaintiff's decision to enter into the June 2008 loan transaction. The plaintiff, who practiced as an attorney, signed the IAA in his capacity as trustee of his revocable trust and is thus charged with knowledge of the IAA's provisions. See Burwell, 340 S.E.2d at 789 ("[E]very contracting party owes a duty to the other party to the contract and to the public to learn the contents of a document before he signs it."); Regions Bank, 582 S.E.2d at 440 ("A person signing a document is responsible for reading the document and making sure of its contents."). These provisions include that the defendant's duties are "limited to those specifically listed" and that the IAA "constitutes the entire agreement between the parties." IAA, arts. X and XIII. The Court has reviewed the evidence the plaintiff cites in support of his argument that a fiduciary relationship and duties beyond that specified in the IAA existed, including Mozingo's deposition testimony where he indicated his relationship with the defendant never really changed and Jordan said everything would be kept the same and "kept on the trust platform." Mozingo Dep. p. 221 (Doc. # 99, attach. 1). The facts do not support this statement in light of the plaintiff's revocation of the trust relationship. As well, in the face of the IAA's express terms, this evidence is insufficient to demonstrate the existence of a fiduciary relationship or duties beyond what is set forth in that Agreement, that being the defendant's responsibility related to investment advice, not financing matters.[5]

### 2. Speedway Stock

The plaintiff's argument regarding the Speedway stock is that the defendant "represented to Mozingo in April 2008 that it would count the Speedway stock as eligible collateral, and that

---

[5] The Court's decision is not altered by the plaintiff's statement that he ended the trust relationship and entered into the IAA in order to save fees. Mozingo Dep. p. 221 (Doc. # 99, attach. 1). This position does not alter the fact that the trust relationship ended in May 2008 at the direction of the plaintiff.

it did initially count the Speedway stock - - but that it stopped counting the Speedway stock in October 2008 when it benefitted Wachovia to do so." Pl. Resp. to Def. Mot. Summ. J., p. 25 (Doc. # 99). Additionally, the plaintiff asserts that the defendant "stopped counting the Speedway stock, issued a collateral call, and told Mozingo that it would start counting the Speedway stock again if Mozingo sold his FCB stock and applied the proceeds to the $4 million loan." Id. at pp. 27-28. Essentially, the plaintiff argues that the defendant had a fiduciary duty to continue counting the Speedway stock toward the minimum collateral requirement once it said it would count the stock and that it breached this duty when it stopped doing so and issued a collateral call. The plaintiff asserts he then suffered the damages he alleges in connection with the sale of the FCB stock because the defendant conditioned counting the Speedway stock again on the plaintiff agreeing to sell the FCB stock and applying the proceeds to pay down the loan. For the reasons below, the Court finds summary judgment appropriate.

In order for there to have been a fiduciary duty to continue counting the Speedway stock toward the minimum collateral requirement, there must have been a fiduciary relationship in place at the time the duty was undertaken, which is when the defendant made the representation the stock would count. Any statements about what counted as collateral toward the June 2008 loan are tied to that loan agreement. As stated, this Court has concluded the fiduciary relationship created by the IAA gave rise to no duties relating to the plaintiff's decision to enter into the June 2008 loan. The Court also has found there was no fiduciary relationship independent of the IAA that imposed duties on the defendant relating to the June 2008 loan transaction. Therefore, the plaintiff must show he was told the Speedway stock would count as eligible collateral toward the $4 million loan while the defendant was a co-trustee.

As evidence the defendant made such a representation in April while it was a co-trustee, the plaintiff cites pages 255-257 of Mozingo's deposition and pages 193-195 of Jordan's deposition.  Pl. Resp. to Def. Mot. Summ. J., pp. 4-5 (Doc. # 99).  On these pages of Jordan's deposition, the following exchange takes place between the plaintiff's attorney and Jordan:

> Q. Well it had to be an eligible stock because you brought it in [as collateral] in April to satisfy a shortfall, right?
>     Ms. Blair: Object to the form.
> Q. And Aladdin was told that it was an eligible stock, correct?
>     Ms. Blair: Object the form
> A. It was included as a part of an eligible stock from my knowledge.
> Q. But was Aladdin told that it was being counted as an eligible stock?
>     Ms. Blair: Object to form.
> A. I don't know if he - - that's the reason why they moved it over there.

Jordan Dep. p. 194 (Doc. # 99, attach. 2).  As for Mozingo's deposition, the following testimony appears on the pages cited:

> Q. Okay.  Have you ever alleged, or are you contending that any bank personnel told you that the International Speedway or Raceway stock would count as collateral with respect to the June 12th, security agreement?
> A. Yes.  I always thought the Speedway stock was being counted.
> Q. Is that because of the assumption we talked about earlier?
> A. That was because - - I mean, yeah - - well, Dave said he was going to count it. I never knew it was not eligible until he said, well, we can move the Raceway stock over into the collateral account.
> Q. David McDowell?  You're saying he told you that?
> A. Uh-huh.
> Q. And when did that conversation occur?
> A. That happened when - - it was [Delores Jordan], Sean, Dave, Billy and me, and that's when Dave said, well, we could count the Speedway stock.  And that's when Deedie said, well, do you want me to move it from the custody account to the collateral account, and he said yes.
> Q. Where were you meeting?
> A. At the bank.
> Q. When did this meeting occur?
> A. I have no idea time-wise.
> Q. All right.  In terms of the misrepresentations you allege the bank made to you, are you saying during that meeting with the bankers in Columbia that they told you that the First Carolina Bank stock would be counted or just that the Speedway stock would be counted?

A. Just the Speedway stock.  I always assumed that the Carolina Bank stock was being counted.

Mozingo Dep. pp. 255-57 (emphasis added) (Doc. # 99, attach. 1).  The Court finds this evidence does not create a genuine dispute of material fact regarding whether the defendant undertook a fiduciary duty to continue counting the Speedway stock toward the minimum collateral requirement by representing to the plaintiff, while it was a co-trustee, that it would count the stock.[6]

Assuming the plaintiff was told while the defendant was a co-trustee that the Speedway stock would count, the plaintiff provides no authority demonstrating a continuing duty to count the stock after the plaintiff revoked the trust relationship.  As noted previously, there was no fiduciary relationship that gave rise to duties in connection with the June 2008 loan transaction after the defendant's removal as co-trustee in May 2008.  Thus, summary judgment is also appropriate because there was no ongoing duty to count the Speedway stock after the relationship out of which the duty arose ended.  Cf. Am. Bankers Life Assurance Co. of Fla. v. Frederick, 431 S.E.2d 636, 639 (S.C. Ct. App. 1993) (holding there was no breach of fiduciary duty in lawsuit between insurance company and former agent where insurance company alleged that former agent encouraged policyholders to transfer coverage to other insurance companies after the insurance company terminated its agreement with the agent and where there was no

---

[6] In the defendant's first set of interrogatories and requests for production, it requested that the plaintiff provide details about each misrepresentation it allegedly made, including the date and time of each alleged misrepresentation.  (Doc. # 74, attach. 26).  The plaintiff, in a response dated January 23, 2012, indicated that "David McDowell and Arnold Ceips stated to Plaintiff that the [Speedway] stock would count as collateral against the June 12, 2008 Security Agreement during a meeting in Columbia, SC in June 2008.  Other individuals present include Delores Jordan, Dillon Harris, and William Mozingo." Id. (emphasis added).  The plaintiff also responded that a second misrepresentation about counting the Speedway stock occurred in November 2008.  Id. (emphasis added).  Therefore, the plaintiff, in his response to the defendant's interrogatory, indicated that both misrepresentations related to the counting of the Speedway stock took place after the plaintiff ended the trust relationship in May 2008.

evidence of a breach of fiduciary duty while the principal-agent relationship was in effect); <u>Hotz v. Minyard</u>, 403 S.E.2d 634, 637 (S.C. 1991) (holding summary judgment was improperly granted to defendant attorney where there was evidence of a fiduciary relationship between the plaintiff and the attorney at the time the attorney breached a duty by allegedly making misrepresentations to the plaintiff).

Moreover, the Court has reviewed the evidence the plaintiff cites in support of his argument that the defendant caused the October 2008 collateral call by ceasing counting the Speedway stock toward the $4.8 million collateral requirement.  The Court finds that the plaintiff's position is not supported by the evidence referenced, as the evidence does not show that counting the Speedway stock results in the collateral value being above $4.8 million.  Pl. Resp. to Def. Mot. Summ. J., p. 6 (Doc. # 99) (citing McDowell Dep., ex. 19 (Doc. # 99, attach. 5); McDowell Dep., ex. 16 (Doc. # 99, attach. 5)).  Furthermore, one document cited by the plaintiff, which is a letter addressed to the plaintiff notifying him of the collateral shortfall and the requirement that he remedy it, is attached to an email stating that the collateral market value indicated in the letter includes the Speedway stock.[7]  Pl. Resp. to Def. Mot. Summ. J., p. 6 (Doc. # 99) (citing McDowell Dep., ex. 22 (Doc. # 99, attach. 5)).  The evidence the plaintiff references in support of his argument that the defendant conditioned counting the Speedway stock again on the plaintiff selling the FCB stock and applying the proceeds to pay down the loan is an October 27, 2008 email from David McDowell, a Senior Vice President at Wachovia, to Jordan, which states:

> To summarize, Aladdin and Billy are interested in liquidating the First Carolina stock and applying the proceeds to paydown our line. . . .

---

[7] At this deposition, the plaintiff testified he could not recall whether he received this letter.  Mozingo Dep. p. 250 (Doc. # 74, attach. 3).

> If the First Carolina stock is liquidated, then we agree to amend our loan documents to reflect a new maturity date of Jan., 2009, allow the speedway stock to be eligible with a margin of 80%, and that combined with the existing portfolio, should support a line amount of $1,663,000.
>
> Assuming that they receive $586,170 for their First Carolina Bank stock, current loan balance of $2,300,000 would be reduced to $1,713,830. Aladdin & Billy would need to pay down the balance by $50,830 to get to the $1,663,000. It did not seem on the phone that this would be a problem.[8]

McDowell Dep., ex. 25 (Doc. #99, attach. 25). This email indicates that even after applying the proceeds from the sale of the FCB stock and counting the Speedway stock, the plaintiff had to pay down the loan further to bring it into margin. In addition, the plaintiff's alleged injury is tied specifically to the sale of the FCB stock. The plaintiff provides no explanation as to why it would matter to the defendant whether he sold the FCB stock or something else to obtain cash to pay down the loan in order to bring it into margin.[9] Finally, considering there were no fiduciary duties owed in connection with financing matters after the plaintiff ended the trust relationship, the defendant was free to include the Speedway stock in the bargain it struck with the plaintiff after he dropped below the $4.8 million collateral requirement and did not remedy the shortfall within three days. See June 12, 2008 Security Agreement (Doc. # 74, attach. 25).

*3. October 2008*

The plaintiff asserts the defendant owed him fiduciary duties in connection with his decision to remedy the October 2008 collateral shortfall by selling the FCB stock. As previously stated, the Court finds that after the defendant's removal as co-trustee in May 2008 and the

---

[8] This email from McDowell to Jordan further demonstrates the lack of evidence the defendant caused the collateral shortfall that resulted in the collateral call by not counting the Speedway stock. The email indicates that the plaintiff still needed to come up with $50,830 even after counting Speedway stock and applying the proceeds from the sale of the FCB stock.

[9] The plaintiff argues he offered the nearly-completed Lake House Project and other unencumbered real estate as collateral when the shortfall occurred, but the defendant refused to accept these items. However, this real estate did not meet the parameters in the June 2008 security agreement for what constituted eligible collateral, meaning the defendant was under no obligation to accept it. See June 12, 2008 Security Agreement (Doc. # 74, attach. 25).

signing of the IAA, a limited fiduciary relationship existed between the parties that imposed no duties related to the plaintiff's decision to enter into the June 2008 loan. Consequently, the Court also finds that the defendant owed no fiduciary duties in connection with the plaintiff's decision about how to remedy the collateral shortfall that occurred in October 2008. Furthermore, the plaintiff decided to sell the FCB stock at $65 per share with knowledge that the defendant had valued it at $221 per share.[10]  May 4, 2012 Hr'g Tr. pp. 84-85 (Doc. # 110).

**B. Fraud**

The second cause of action asserted in the plaintiff's complaint is for constructive and actual fraud. The plaintiff asserts the defendant committed fraud when it said it would count the Speedway stock toward the collateral requirement and then stopped counting the stock. The parties do not dispute that the defendant indicated it would count the Speedway stock and did so at least initially, but they dispute whether the defendant later stopped counting it. The parties also do not dispute that the defendant counted it after the October 2008 collateral call. Pl. Resp. to Def. Mot. Summ. J., pp. 27-28 (Doc. # 99).

South Carolina law provides` that "[i]n an action for actual fraud, the alleged representation must be one of existing fact, not merely promises or statements as to future events which later were unfulfilled. Unless the plaintiff can show that a defendant made a promise of future action with no intention of fulfilling the promise at the time it was made, the representation cannot be the basis of an action for fraud." Woods v. State, 431 S.E.2d 260, 263 (S.C. Ct. App. 1993) (citation omitted); see also Network Computing Serv. Corp. v. Cisco Sys.,

---

[10] The Court does not find the plaintiff's statements during his deposition that the defendant told him he needed to sell stock to resolve the collateral shortfall and that the defendant recommended what stocks to sell are sufficient to create a fiduciary relationship and corresponding duties beyond what is set forth in the Investment Advisory Agreement. Mozingo Dep. p. 253 (Doc. # 99, attach. 1).

Inc., 152 Fed. Appx. 317, 322 (4th Cir. 2005) ("The district court did not allow NCS to rest on the suggestion that, because Cisco did not do all that it could have done to help NCS sell products after the contract was executed, Cisco must have lacked intent to perform the promise at the time the contract was executed.  In so holding, the district court correctly applied South Carolina law."); Schie v. Gay & Taylor, Inc., 347 S.E.2d 910, 912 (S.C. Ct. App. 1986) ("Both representations are merely promises of future action and, unless the evidence shows Gay & Taylor had no intention of fulfilling the promises at the time they were made, cannot be the basis of an action for fraud."); Winburn v. Ins. Co. of N. Am., 339 S.E.2d 142, 145 (S.C. Ct. App. 1985) ("An action in fraud, however, can be based on an unfulfilled promise to perform in the future made with a present undisclosed intention not to perform and for the purpose of inducing one to sign a paper or do some other act.").  Furthermore, "[e]vidence of mere nonperformance of a promise is not sufficient to establish either fraud or a lack of intent to perform.  Nonobservance of a promise may support an inference of a lack of intent to perform only when it is coupled with other evidence."  Id. (citing Winburn, 339 S.E.2d at 146).  A "mere broken promise" is not actionable "even if a party acts in reliance on the promise."[11]  Winburn, 339 S.E.2d at 145.

The plaintiff has not presented evidence that the defendant lacked intent, at the time the alleged statements were made, to continue counting the Speedway stock toward the minimum collateral requirement.  As evidence of intent, the plaintiff cites a July 1, 2008 "Risk Assessment Summary" Ceips prepared in connection with the June 2008 loan transaction, which states the primary source of repayment would be "[l]iquidation of the collateral account."  Pl. Resp. to Def. Mot. Summ. J., p. 28 (Doc. # 99) (citing Ceips Dep., ex. 15 (Doc. # 99, attach. 12)).  However,

---

[11] The plaintiff has presented no argument or authority indicating his constructive fraud claim should be evaluated differently.

the plaintiff provides no explanation as to the purpose for which a Risk Assessment Summary is prepared.  Moreover, the Risk Assessment Summary is dated July 1, 2008, almost a month after the plaintiff signed the June 2008 security agreement which contains the minimum collateral requirement toward which the plaintiff alleges the defendant misrepresented the Speedway stock would count.  The Court finds that this document is not evidence of a lack of intent on the defendant's part to continue counting the Speedway stock at the time the alleged statements were made and thus that there is no evidence for the plaintiff to move past summary judgment on his fraud claim.  The case law provides that a promise of future action cannot be the basis of an action for fraud unless the plaintiff can show a defendant made a promise with no intention of fulfilling it and that "[e]vidence of mere nonperformance of a promise is not sufficient to establish either fraud or a lack of intent to perform."  Woods, 431 S.E.2d at 263; see also Network Computing Serv., 152 Fed. Appx. at 322. Schie, 347 S.E.2d at 912; Winburn, 339 S.E.2d at 145.  The evidence asserted by the plaintiff shows no promise by the defendant that it had no intention of fulfilling.  There is no evidence that any statement made by the defendant was fraudulent or made to deceive.[12]

---

[12] The plaintiff, in his response to the defendant's first set of interrogatories and requests for production, stated that the defendant's misrepresentations included Jordan continuously giving "Plaintiff false assurances that the actions he was taking and the transactions she was recommending were in his best interest."  (Doc. # 74, attach. 26).  In its motion for summary judgment, the defendant argues these alleged statements "are expressions of opinion not statements of fact and therefore are not actionable as fraud."  Def. Mem. Law Supp. Mot. Summ. J., p. 24 n.14 (Doc. # 74, attach. 1); see Winburn, 339 S.E.2d at 145 ("To establish actionable fraud, there first must be a false representation.  The false representation, however, must be one of fact as distinguished from the mere expression of an opinion.").  The plaintiff did not respond to this argument.  Therefore, summary judgment is also appropriate to the extent the plaintiff asserts a fraud claim based on alleged misrepresentations by Jordan that she was acting in the plaintiff's best interest.

**C. Punitive Damages**

Having found that the plaintiff's claims are subject to summary judgment, there is no need for the Court to rule on whether the plaintiff waived his right to seek punitive damages in this case.

<u>**CONCLUSION**</u>

For the reasons set forth herein, the defendant's motion for summary judgment (Doc. # 74) is **GRANTED**, and this case is **DISMISSED** in its entirety.  The defendant's motion to strike plaintiff's request for a jury trial (Doc. # 62) is now **MOOT**.

**IT IS SO ORDERED**.

<u>s/Terry L. Wooten</u>
TERRY L. WOOTEN
United States District Judge

September 26, 2012
Florence, South Carolina